UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

BRIAN BURCKHARTTE,

    Plaintiff,

v.

GENERAL MOTORS, LLC,

    Defendant.

CAUSE NO. 1:19-CV-399 DRL

OPINION AND ORDER

In August 2017, Brian Burckhartte, an ironworker employed by a contractor renovating an automaker's Fort Wayne assembly plant, suffered serious injuries to his foot when a crane outrigger struck him. His foot required amputation. He sued the automaker for negligence and premises liability. Because the duty for safety remained on this record with the contractor, not the automaker, the court grants summary judgment.

BACKGROUND

General Motors, LLC (GM) entered into a $31 million contract with Commercial Contracting Corporation (CCC) to renovate its Fort Wayne assembly plant. Article 9 of their contract covered safety measures [126-1 at 7, Art. 9]. CCC agreed to abide by GM's "Special Safety Conditions" [126-1 at 7, 9.1]. The parties also agreed as follows:

> [CCC] is solely responsible for supervising and directing the activities of its employees, Design Professionals, and Subcontractors so that they perform their work and otherwise conduct themselves in a manner consistent with requirements of the Contract Documents. However, [GM] has the right to stop [CCC] activities that [GM] reasonably believes are being performed in a manner that presents an imminent danger of death or serious injury. [GM]'s exercise of its rights under this provision, even if mistaken, will not be grounds for an increase in the Contract Sum under the Contract. [GM]'s review or acceptance of [CCC]'s Job-Site Safety Plan, Pre-Task Plan or any safety measures proposed or implemented by [CCC], will not impose upon [GM] any responsibility for [CCC]'s safety management methods or programs and does not relieve [CCC] from its obligations under the Contract Documents or which may otherwise be imposed by law [126-1 at 12; 9.15].

The conditions stated that "[CCC] is exclusively responsible for its compliance with applicable laws and must implement a systematic approach to identify SAFETY regulatory requirements applicable to its operations" [126-2 at 5, 4.2.2]. GM required CCC, as a contractor, to meet a list of prequalifications and develop and submit a safety plan for GM's contract manager to review before beginning the project [*id.* 2-5, 4.1, 4.2]. GM also required CCC to have "individual(s) trained and knowledgeable in health [and] safety appropriate to the nature of the Work being performed" [*id.* 5, 4.2.1]. The contract mandated that these individuals "be present at the job-site whenever work is being performed and [] have authority to promptly act on [CCC]'s behalf to address health and safety issues and control or eliminate hazards" [*id.*]. In addition, CCC had to conduct safety training, including training its employees on GM's safety conditions [*id.* 6, 4.2.4]. The contract expressed GM's expectation that CCC would use its own equipment, and it mandated that if CCC used GM's, it do so safely [*id.* 14, 4.2.7].

CCC employed safety officers like George Horton, who estimated he was at the site 14-16 hours a day and on the work floor for 8-10 of these hours [126-6 Tr.146]. Mr. Horton described the safety training and orientation, which included GM and CCC videos [*id.*]. In his role as a CCC employee, the plaintiff, Brian Burckhartte, remembered watching these safety trainings onsite in a CCC trailer [128-1 Tr.33]. Dan Cobley served as CCC's "superintendent of safety for the whole site" [126-5 Tr.9-10]. Mr. Cobley testified that he, in his role as a CCC employee, "pretty much staffed the whole site with safety personnel and assigned and ran the safety portion of the project" [*id.* Tr.10]. He admitted that he saw CCC crews "not properly using a signalman or a spotter" more than once [*id.* Tr.113]. Employees testified that they knew CCC was responsible for the safety of its staff and did not expect GM to be supervising, including on the night of August 21, 2017 when this accident occurred [126-6 Tr.152].

GM actively monitored contractual compliance with safety procedures and employed a "safety contract management performance standard champion" [128-3 Tr.174]. Its employees exercised the right to stop work "dozens of times" throughout the project [*id.* Tr.118]. Steven Andreen, a GM employee,

2

accompanied CCC supervisors Dan Cobley and George Horton on safety tours when he could [128-3 Tr.117]. He also received reports from CCC on safety [*id.* Tr.117]. Pablo Estrada, another GM employee, explained that contractors, like CCC, were required to hold safety meetings at the beginning of each shift, and his role included ensuring that contractor teams had gone over job specific safety instructions before beginning work [128-6 Tr.26-27]. If he witnessed safety noncompliance, he would inform CCC's supervisor or foreman so that CCC could address it [*id.* Tr.40]. Additionally, GM employed a plant safety supervisor, Lara Ryan [128-4 Tr.34]. She testified that she was "not familiar with construction site safety," [*id.* Tr.79], but she confirmed that GM maintained control over plant access, where materials could be stored, and work hours and noted that GM retained rights to inspect the work [*id.* Tr.82]. Another GM employee, Anthony Sexton, clarified that safety "was CCC's responsibility" but acknowledged that GM "acted in a supplemental manner" [128-5 Tr.57].

Unfortunately, no safety supervisors or contract provisions prevented the tragedy that occurred on August 21, 2017. Mr. Burckhartte was working as a CCC ironworker at the Fort Wayne assembly plant. That day, he was tasked with rigging a scissor lift over a floor conveyor as workers tried to clear out congested equipment [126-4 Tr.54-56]. His crew worked under a CCC employee [126-6 Tr.150], in an area "relatively congested" with people and materials [126-5 Tr.28]. Mr. Burckhartte was acting according to direct instructions from his CCC foreman, without any direct communication with GM that day [126-4 Tr.58]. The day of his injury, his team was missing a signal person or spotter for the operation of the Broderson crane, and he heard no warnings as he worked [126-8 Tr.111-112; 126-4 Tr.65].

Mr. Burckhartte stood up from his position working on the floor, and the crane's right front outrigger extended and caught his leg [126-4 Tr.65]. At the time of his injury, GM employees were within about 100 feet [128-1 Tr.63-64], but only CCC personnel were using and operating the equipment that injured him [128-1 Tr.54]. After the crane outrigger crushed his foot, Mr. Burckhartte was hospitalized for three weeks and had to undergo multiple surgeries [128-1 Tr.71]. His care, based on reports the court

3

has received since this motion was filed, continues. He sued GM to recover for his injuries, and GM now moves for summary judgment on all counts.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in its favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

Both parties cite Indiana law, and the court sees no reason to depart. *See Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 n.1 (7th Cir. 2012). A negligence claim requires Mr. Burckhartte to prove three elements: "(1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Yost v. Wabash College*, 3 N.E.3d 509, 515 (Ind. 2014). "Whether a duty exists is generally a question of law for the court." *Id.* Without a duty, no viable negligence claim exists. *Ryan v. TCI Architects/Engineers/Contrs., Inc.*, 72 N.E.3d 908, 913 (Ind. 2017).

Indiana follows the general rule that "a principal is not liable for the negligence of an independent contractor." *Bagley v. Insight Commc'ns. Co., L.P.*, 658 N.E.2d 584, 586 (Ind. 1995). There are five exceptions: "(1) [when] the contract requires the performance of intrinsically dangerous work; (2) [when] the principal is by law or contract charged with performing the specific duty; (3) [when] the act will create a nuisance; (4) [when] the act to be performed will probably cause injury to others unless due precaution is taken; and (5) [when] the act to be performed is illegal." *Id.* These represent "specific, limited situations in which the associated duties are considered non-delegable because public policy concerns militate against permitting an employer to absolve itself of all further responsibility by transferring its duties to an independent contractor." *Id.* at 588.

The parties debate only one of these exceptions and concede that the construction contract never charged GM with the specific safety duty at issue today. Mr. Burckhartte contends the second exception applies—more particularly that GM assumed a duty through its actions.

Indiana law may impose a duty of care when someone "assumes such a duty, either gratuitously or voluntarily." *Hunt Constr. Grp., Inc. v. Garrett*, 964 N.E.2d 222, 225 (Ind. 2012) (quoting *Plan-Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1219 (Ind. Ct. App. 1983)). "The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999) (citation omitted). This assumption under the law requires "affirmative, deliberate conduct" that makes it "apparent that the actor specifically undertook to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform." *Yost*, 3 N.E.3d at 517 (ellipses and quotations omitted).

This duty's existence and scope are ordinarily questions of fact, *see Delta Tau Delta*, 712 N.E.2d at 975; *Plan-Tec*, 443 N.E.2d at 1220, but the court may decide whether such a duty has been assumed as a matter of law "when the record contains insufficient evidence to establish such a duty," *Delta Tau Delta*,

5

712 N.E.2d at 975; *Marks v. N. Ind. Pub. Serv. Co.*, 954 N.E.2d 948, 956 (Ind. Ct. App. 2011). For instance, a duty is not assumed "merely because [the site owner] may have a right to inspect and test the work, approve the work [or] supervise employees of the independent contractor, or even by requiring the contractor to follow company safety rules." *Beatty v. LaFountaine*, 896 N.E.2d 16, 23 (Ind. Ct. App. 2008); *accord Marks*, 954 N.E.2d at 955-56. Nor does the law "extend a specific duty to an owner[] [when] the contract prescribed safety rules and required the contractor to observe those rules or any laws relating to safety." *Phillips v. United Eng'rs & Constructors, Inc.*, 500 N.E.2d 1265, 1268 (Ind. App. Ct. 1986).

The law examines an owner's affirmative and deliberate conduct to ascertain not just whether the owner has undertaken a duty but a duty to act "in lieu of the original party." *Griffin v. Simpson*, 948 N.E.2d 354, 360 (Ind. Ct. App. 2011) (quotations and italics omitted); *see also Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 744 (7th Cir. 1999); *Carson v. E.On Climate & Renewables*, 154 F.Supp.3d 763, 767 (S.D. Ind. 2015). "The mere performance of coordinate or duplicative functions will not suffice." *N. Ind. Pub. Serv. Co. v. E. Chi. Sanitary Dist.*, 590 N.E.2d 1067, 1074 (Ind. Ct. App. 1992). Instead, the owner must undertake the duty "specifically and deliberately," and the other party must "relinquish control of the obligation." *Griffin*, 948 N.E.2d at 359-60. When a contract imposes no duty, the jobsite owner "must undertake specific supervisory responsibilities beyond those set forth in the original construction documents" for the company to assume a duty. *Hunt*, 964 N.E.2d at 230 (distinguishing *Plan-Tec*, 443 N.E.2d at 1220).

The law promotes efforts to facilitate safety but without the corollary risk that every little step risks the imposition of liability. It isn't the case that the "only way to avoid liability is to turn a blind eye toward safety." *Id.* at 229. It takes specific and deliberate action to assume a duty of care. *See Yost*, 3 N.E.3d at 517; *Griffin*, 948 N.E.2d at 359-60.

For example, in *Perry v. N. Ind. Pub. Serv. Co.,* 433 N.E.2d 44, 49 (Ind. App. Ct. 1982), NIPSCO hired a contractor to erect mechanical equipment at one of its generating stations, and thereafter held

6

regular safety meetings, kept six to thirty of its own safety personnel onsite—who had "jurisdiction of the safety program"—and employed its own safety supervisor who spoke to the plaintiff about the hazard minutes before the injury occurred and ignored it. *See id.* at 46, 49-50. This created a triable issue.

Similarly, when a company inspected the site and equipment daily, appointed its own safety director, held safety meetings, issued safety directives to the contractor's employees, inspected the very scaffolding that collapsed, and—here another critical point—agreed to take on specific supervisory responsibilities beyond those spelled out in the construction documents (safety responsibilities otherwise imposed on the contractor), then too a jury's verdict against the company (a construction manager) was left to stand. *See Plan-Tec*, 443 N.E.2d at 1220-21; *see also Hunt*, 964 N.E.2d at 230.

In contrast, when NIPSCO hired an independent contractor to recycle coal ash produced at three of its generating stations and did no more than its contract permitted, no duty was assumed to the contractor's truckdriver who was injured during the loading process onsite. *Marks*, 954 N.E.2d at 951, 956. NIPSCO required the contractor's employees to be knowledgeable of its safety rules, evaluated contractors on their safety record, and contractually could hold safety meetings and inspect work sites. NIPSCO's safety rules required the contractor's employees to wear certain gear and to follow certain precautions. The contractor retained the task of ensuring compliance with safety rules and holding any safety orientation. There the record presented no triable issue to preclude summary judgment. *Id.* at 956.

The contract here imposed no duty on GM to ensure the safety of CCC's employees, and everyone seems to agree on this. CCC retained sole responsibility for "supervising and directing the activities of its employees." CCC had the obligation to designate "individual(s) trained and knowledgeable in health and safety" to be onsite, to prepare and implement a detailed "job-safety plan," to conduct weekly inspections, to prepare and conduct a detailed safety orientation for its employees, to organize weekly safety meetings, and to comply with GM's safety conditions and pertinent laws and regulations.

7

In addition, no evidence has been adduced that GM exceeded its contractual allowance vis-à-vis safety. *See Hunt*, 964 N.E.2d at 230. GM reserved the right to inspect the work and receive reports, but that alone does not mean the company assumed a duty to this CCC employee. *See Beatty*, 896 N.E.2d at 23. GM could "stop [CCC's] activities that [GM] reasonably believes are being performed in a manner that presents an immediate danger of death or serious injury," but nothing on this record shows that GM went beyond this allowance and supplanted CCC's responsibility for safety. To that point, the contract explained that GM's review or acceptance of CCC's job-site safety plan or other safety measures would "not impose upon [GM] any responsibility for [CCC]'s safety management methods or programs and does not relieve [CCC] from its obligations under the Contract Documents."

Mr. Burckhartte offers testimony from GM employees about stopping CCC's work as evidence that GM assumed a duty. GM's lead safety supervisor (Lara Ryan) acknowledged that its employees could act if CCC failed to comply with contractual safety requirements [128-4 Tr.84]. One GM employee (Steven Adreen) stopped CCC's work "dozens of times," for not wearing hard hats and safety glasses, failing to provide spotters near lift operation, and driving flatbeds or forklifts too fast [128-3 Tr.118-123]. Another GM supervisor (Anthony Sexton) also stopped CCC's work precisely because of an absent spotter during operation of a crane or overhead lift, though not on this particular occasion [128-5 Tr.113-114]. In the event of an absent spotter, GM never required a safety meeting or training on that issue but reported the issue to CCC for the contractor to address [126-3 Tr.124-125]. Nothing on this record shows that GM went beyond its contract, or that GM supplanted CCC in its responsibility for safety. One GM supervisor even explained that safety remained "CCC's responsibility" and that GM acted only in a "supplemental manner" [128-5 Tr.57]. *See Hunt*, 964 N.E.2d at 230; *Griffin*, 948 N.E.2d at 359-60.

A reasonable jury could find that GM employees focused on ensuring compliance with its contract, but not that they exceeded its allowance or assumed a duty, in lieu of CCC, to CCC's employees. For another example, one GM employee (Pablo Estrada) was tasked with "making sure that the safety

8

aspects of the job were being followed and then met in accordance with the contract the way it was laid out." [128-6 Tr.25]. *See Beatty*, 896 N.E.2d at 23 (no assumption when owner may have right to inspect or approve work or require contractor to follow safety rules); *Armstrong v. Cerestar USA, Inc.*, 775 N.E.2d 360, 371 (Ind. Ct. App. 2002) (same). He confirmed that CCC's supervisors (not GM) conducted safety meetings before shifts [128-6 Tr.26]. Importantly, when GM employees saw a problem, they reported the problem to CCC's supervisors rather than take their own enforcement action [128-6 Tr.40; 126-8 Tr.54-55]. No reasonable jury could say on this record that GM assumed a duty specific to Mr. Burkhartte or this spotter-less lift on this record, and in place of CCC; and imposing such a duty would place GM precisely in the liability conundrum Indiana law rejects. *See Hunt,* 964 N.E.2d at 229.

The record forecloses a reasonable jury from finding that CCC relinquished control of safety to GM, or because of GM's specific and deliberate conduct that the company assumed this duty in lieu. CCC maintained safety supervisors on site [126-5 Tr.9-10]. CCC employed a safety superintendent (Dan Cobley) for the whole site, who "pretty much staffed the whole site with safety personnel and assigned and ran the safety portion of the project" [*id.*]. Indeed, his direct supervisor (George Horton) said he would not have expected GM employees to supervise the CCC crew on August 17, 2021 [126-6 Tr.152]. Everyone he said was responsible for safety, but CCC remained "primarily responsible for [its] own safety" [*id.*]. GM employees (such as Steven Andreen) went on safety tours only with CCC's safety officers, not alone, so the duty remained at all times with CCC without GM exceeding its contract, as seen in other cases. *See, e.g., Plan-Tec*, 443 N.E.2d at 1220-21; *see also Hunt*, 964 N.E.2d at 230. This contrasts sharply with cases when an owner claimed or assumed responsibility for the contractor's safety (*e.g.*, assuming jurisdiction of the safety program), or some measure of it, based not just on the presence of the owner's safety personnel but on their conduct of controlling safety or assuming responsibility in lieu of the contractor. *See, e.g., Perry*, 433 N.E.2d at 49; *Phillips*, 500 N.E.2d at 1269. A reasonable jury

9

could say GM monitored CCC's contract compliance, but not that GM assumed a duty to Mr. Burckhartte. That responsibility for safety and supervision remained with CCC.

Mr. Burckhartte also points to his opinion witness (David Soderman) to suggest that GM assumed a duty with reference to OSHA (Occupational Safety and Health Administration) standards. He offers theories that GM became a "controlling employer," "correcting employer," and "creating employer" under OSHA directives, or based on work or change orders. He applies OSHA standards to opine on what GM should have done to secure the area. He admits to using "certain OSHA and ANSI standards regulating safe work practices" (ANSI is the American National Standards Institute). But the issue here isn't whether GM had obligations under OSHA standards but whether the company assumed a duty to CCC's employee under Indiana law, and his opinions offer no basis for a reasonable jury to answer this question. *See Stumpf v. Hagerman Constr. Co.*, 863 N.E.2d 871, 880 (Ind. Ct. App. 2007) (OSHA testimony not pertinent to whether a duty of care arose); *Merrill v. Knauf Fiber Glass, GmbH*, 771 N.E.2d 1258, 1263-64 (Ind. Ct. App. 2002) (proper for trial court to exclude OSHA expert opinion when determining whether duty existed); *see also* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp.3d 965, 974 (N.D. Ind. 2020) (opinion does not fit because it "does not reliably guide the jury to answer the question it must").

Mr. Burckhartte cites a Restatement provision for the proposition that "[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965); *see also Pelak v. Ind. Indus. Servs.*, 831 N.E.2d 765, 770 (Ind. Ct. App. 2005). But this mechanism for imposing liability on a landowner because of its control over the operative detail of the work does not apply when the owner "has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations [that] need not necessarily be

10

followed, or to prescribe alterations and deviations." Restatement § 414 cmt. c. For a reasonable jury looking at this record, that is the sum total of what GM's contract permitted and the sum total of what GM's employees did. There is no sound argument for "imposing on [GM] a duty to guard a contractor's employees from an instrumentality exclusively controlled by the contractor"—as here—because the "contractor has the superior experience, equipment, knowledge, staff, and incentive to protect its employees." *Pelak,* 831 N.E.2d at 770.

Nothing on this record shows that GM "assumed control of the instrumentality." *Id.* at 771; *see also Zawacki v. U.S.X.*, 750 N.E.2d 410, 415 (Ind. Ct. App. 2001) (*citing Douglass v. Irvin*, 549 N.E.2d 368, 370-71 (Ind. 1990)). Both parties acknowledge that CCC controlled the crane that injured Mr. Burckhartte. That GM always maintained control of the plant isn't enough. Mr. Burckhartte reported directly to a CCC employee, and he knew CCC's safety supervisors [128-1 Tr.32, 68]. On the day of his accident, he had no direct communication with anyone from GM [126-4 Tr.58]. He typically received orders from his CCC foreman [*id.*]. *See Carson*, 154 F.Supp.3d at 768 (no duty when owner held general safety meetings never became aware of the specific danger to the employee and never gave the employee instructions regarding his job). GM employees were not even close to him when he was injured—100 feet he thought, but no one in particular he could identify [*id.* Tr.63-64]. GM employees exercised no direct control over the immediate crane or task that caused the injury, and, at most, oversaw the work [*id.*]—consistent with its contract. This record does not permit a reasonable jury to conclude that GM assumed a duty vis-à-vis Mr. Burckhartte.

For similar reasons, his alternative premises liability theory cannot proceed. Under Indiana law, premises liability depends on "whether the defendant was in control of the premises when the accident occurred." *Yost*, 3 N.E.3d at 516 (quoting *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004)). Control must be over the "manner or means by which the independent contractors" perform their duties, *Phillips*,

11

500 N.E.2d at 1268, and more particularly the "instrumentalities maintained by the party on [its] premises," *Plan-Tec*, 443 N.E.2d at 1219.

Directing where CCC could store construction materials or locate its construction trailers, or defining the plant's work hours, or reserving rights to inspect work, or to require rework consistent with the contract aren't sufficient for a reasonable jury to impose premises liability on GM when the company had no control over the instrumentality here (the crane) and no direction of the work or the manner of its safe completion on this day. No reasonable jury could say there was a dangerous condition in the premises, or that GM controlled the instrumentality this day. *See Pelak*, 831 N.E.2d at 770 (quoting Restatement (Second) of Torts § 414); *see, e.g., Phillips*, 500 N.E.2d at 1267 (holding that premises owner did not retain any control and granting summary judgment because it "required nothing more than that materials furnished and work performed meet the plans and specifications, and that contractors conform to federal, state and local safety regulations"). The court grants summary judgment likewise on this alternative theory of liability.

## CONCLUSION

Accordingly, the court GRANTS GM's summary judgment motion [124] and DENIES AS MOOT its motion to exclude the opinion witness, David Soderman [139]. This order terminates the case.

SO ORDERED.

September 29, 2023  *s/ Damon R. Leichty*
　　　　　　　　　　　　　　　　　　　　　　　　　　　Judge, United States District Court